HARVEY A. SPENCER v. ALBERT LEA BRICK & TILE COMPANY.[1]

March 26, 1909.

Nos. 15,943—(235).

**Assumption of Risk—Contributory Negligence.**

Plaintiff, engaged in putting dressing on a belt near the driving pulley in his employer's shop, was "squatting down" on a beam under the roof, with one leg over a rapidly revolving coupling in the main shaft. His clothing was caught in its projecting bolts. Plaintiff was badly injured. He was an experienced and educated mechanic of full age, whose duty it was to have a general supervision of the machinery of the plant. He had had abundant opportunity for observing the location and nature of the coupling. His own testimony tended to show that he had actual knowledge thereof. His attention had been directed to this particular coupling; and he had on the day of the accident, or on the previous day, repaired a companion coupling on the same shaft a few feet away. His cramped position brought the revolving coupling directly in the line of his sight. He said himself that he could have seen it, if he had looked at it. To a limited extent he admitted knowledge of the danger and appreciation of the risk. He attempted to work in a dangerous way, although other practical and safe means were at hand. It is *held* that he assumed the risk and was guilty of contributory negligence. The fact that the belt was smoking and might have burned at that place did not constitute such an emergency as to exonerate plaintiff from the consequences of his own conduct.

Action in the district court for Freeborn county to recover $25,000 damages for personal injuries. The case was tried before Kingsley, J., who directed a verdict in favor of defendant. From an order denying plaintiff's motion for a new trial, he appealed. Affirmed.

*Morgan & Meighen,* for appellant.

*H. C. Carlson* and *Lafayette French,* for respondent.

JAGGARD, J.

Plaintiff and appellant was employed by defendant and respondent as an engineer in defendant's factory. Another of defendant's servants called the attention of defendant's general manager to a belt which

[1] Reported in 120 N. W. 370, 687.

was slipping on a pulley attached to the main shaft revolving one hundred eighty times a minute, and which therefore failed to operate the pug mill with which it was connected. It was the approved custom to apply a thick resinous fluid, called belt dressing, to stop the slipping. This servant had already attempted to apply the belt dressing, but had failed. Upon his complaint the general manager, having attempted, in the vicinity of the driven pulley, to stop the slipping, and having also failed went to the engine room and called plaintiff out to attend to the trouble. Plantiff came to the platform near the driven pulley, and did not succeed in applying the dressing at that place. He noticed that the belt was smoking at the driving pulley, and knew that, when it commenced smoking, the belt at that place would be destroyed, unless a remedy was provided. This required immediate action. "A man has got to act with promptness." He had left the engine, and naturally wanted to get back to it as soon as he could, especially because he "did not get the engine properly started." He then went up a ladder to a rectangular sort of platform surrounding the driving pulley. He walked on one plank towards the wall, then at right angles behind the shaft to a large beam, 9x12, which was a structural part of the building, and then along that beam towards the belt. To reach the point it was necessary to cross with at least one leg the coupling on the main shaft somewhat east of the large pulley under which the belt ran. The coupling was twelve inches long and eight inches in diameter. Set in grooves were six projecting bolts, which came out from one-half to three-fourths of an inch beyond the surface of the coupling. These bolts projected in the direction that the coupling revolved, and formed "kind of teeth," likely to get hold of any clothing that touched them and draw it round under the coupling. The top of the coupling by which plaintiff was injured was six inches above the top of the surface of the timber, over which it rested; for the bottom line of the shaft was even with the top of the timber, and the timber was eight inches in diameter, of which two inches extended into the groove at the timber and two inches above the top line of the shaft, which was four inches in diameter. Above the timber was the sloping roof. The distance between the timber on which the coupling was rested and the roof diminished as the coupling was approached. The height from the timber to the lowest rafter at the wall was about four feet. This

distance decreased toward the upright support of the roof, until at the first upright the height was but two feet and ten inches. Plaintiff, a light, agile man, although only five feet six inches tall, in order to approach the pulley, had to get into a cramped position. The distance from the extreme edge of the coupling to the edge of the first upright around which plaintiff put or intended to put his arm for support was very small, probably eight and a half or nine inches. Into this space he put his right foot, straddled the line shaft, and "squatted down." He had in his hand a can of belt dressing. While in this position, in the attempt to apply the belt dressing, the unguarded and protruding bolt heads caught his overalls, whereby his leg was drawn in between the coupling and the beam and seriously injured. The revolving coupling was unguarded in fact, although it was entirely feasible to have provided full protection against the danger from it at a slight expense. The court directed a verdict for the defendant, because plaintiff saw the revolving coupling when he was stepping, but was oblivious to what he was doing. The danger was open to ordinary observation. Plaintiff was therefore precluded by his own conduct from recovery. A motion for a new trial on the ground of errors of law and of newly discovered evidence was denied. This appeal was taken from that order.

The trial court assumed that defendant's negligence was sufficiently shown. In view of the conclusion which we feel constrained to reach upon plaintiff's contributory negligence, we also assume that the place in question was a "dangerous place, * * * near to which any employee is obliged to pass or to be employed," within the meaning of the local factory act (section 1813, R. L. 1905). The gist of the appeal is whether the trial court was justified in its peremptory instruction that defendant had assumed the risk and was guilty of contributory negligence as a matter of law. The two distinct defenses, so far as involved in this case, were so interrelated that for purposes of practical convenience they have been considered together in the record. We will therefore so treat them here.

The facts must be considered in the light of principles of law as to which little controversy exists. Plaintiff insists that he "had a right to rely on the assumption that the defendant had performed its statutory duty. He had a right to assume that all projecting bolts, cou-

plings, etc., were protected by guards, or so located as to be safe. His relying on that assumption would not be contributory negligence." This is a clear enough statement of a well-recognized rule of law, except that it fails to recognize that the servant's knowledge of danger and appreciation of risk and his own carelessness may preclude his recovery. It is also undoubtedly true that ordinarily assumption of risk and contributory negligence are for the jury; but it is equally true that where the facts are uncontroverted, and where reasonable men would not draw different inferences from them, the question is for the court. Nor is there any doubt as to the recognition of the principle, which will subsequently be more fully considered, that an emergency may justify conduct which would otherwise be careless. Finally, the facts must be viewed most favorably for plaintiff, and controverted facts resolved in his favor. The circumstances of no particular case to which counsel has referred us sufficiently resemble those presented by this record as to render its discussion useful or appropriate. It would be obviously improper to undertake to here review the whole testimony developed on direct and on cross examination, nor is it possible to discuss the variations in plaintiff's testimony. What will be quoted from it is not intended to represent all the plaintiff said. Plaintiff was not entirely consistent. His inconsistencies, however, usually arose from general denials and from statements of conclusions which are necessarily controlled by his more specific testimony. A number of controlling considerations appear in the record.

1. Plaintiff was not an ordinary servant, and was not called from his regular employment to do special work in another and unfamiliar department. On the contrary, it was the duty of plaintiff, an experienced, educated, and intelligent mechanic of full age, to keep a general supervision of the machinery of the plant and to see that it was running properly when it was in operation. In substantially his own words, he did the oiling in the machinery room; he would go occasionally and see if the machinery was in proper order—see if it needed repairing and that there were no loose bolts; he kept an eye out all the time to see if anything went wrong; if he saw that a bolt was loose, it was his business to tighten it up; in fact, anything that went wrong there along the line shaft he looked out for it, to see that it was corrected.

2. Plaintiff's general opportunity of observing the location and na-

ture of the coupling by ordinary observation was abundant. The coupling was plainly visible from the floor above which the platform had been erected. When he passed from the engine room into the machinery room, he would pass by the coupling, and a glance at the line shaft would have disclosed the coupling by which he was injured. "Q. As a matter of fact that coupling was in plain sight from the place where you were working every day? A. If a man looked toward it, he wouldn't help but see it. * * * Q. Anyone who looked toward the line shaft, in the neighborhood of where that coupling was, could see it? A. Yes, sir." There was much testimony to the same effect. His position as an employee imposed upon him an especial duty of observation and inspection. He differed in this respect from the ordinary servant. His own testimony tends strongly to show that he performed that duty and that he had actual knowledge on the subject. He said he knew that there was no bearing on the timber, and "presumed" that he had examined it when he first went to work. Such examination would, of course, have revealed the coupling. He testified: "Q. You knew there must be couplings along there somewhere on the sixty feet of line shaft? A. Yes, sir. * * * I don't say I hadn't seen it; but I hadn't taken enough notice of it, so it impressed my memory that it was in that place. * * * I certainly must have seen it in passing along that shaft; but I didn't take enough notice of it, so it was impressed on my memory. Q. You must have kept watch of that part of the line shaft as much as any other, to see that it was in proper shape? A. Yes, sir." He had, indeed, told the general manager "that the bolts in the coupling would have to be watched closely, so that they would not get loose." He had been occasionally about the shaft.

3. Plaintiff's attention was directed specifically to this coupling at the time he entered defendant's employment, and afterwards and in a less specific manner immediately before the accident. Defendant's general manager testified to telling plaintiff, in substantially the manager's own language, when plaintiff started to work there, that the bolts in that coupling have to be watched closely, so that they would not get loose. He pointed out the particular coupling to plaintiff, and told plaintiff his previous unfortunate experience with it. From time to time while plaintiff was working there, when the machinery was in

operation, the manager asked about the coupling and how the bolts were in this coupling. Plaintiff said they were all right. On the very morning of the accident plaintiff had told him that there were one or two bolts that were broken in a companion coupling, which apparently was about twenty feet away from the coupling in question. Plaintiff went out, found a bolt, and they both climbed up to where it was and put one on. While they were repairing that coupling, the manager asked plaintiff, "How is the bolts in that coupling?" referring to the coupling in question which later hurt plaintiff. Plaintiff said they were all right. The particular reason in the manager's mind for keeping especial watch of the coupling in question was that he had learned, "from assisting putting the other coupling on, that if the bolts got loose and that coupling broke again, it would necessitate cutting the shaft and moving the shaft together, so as to get new key seats in the shaft." Plaintiff himself does not deny this testimony in toto. He remembered having, with the manager, tightened the bolts on a neighboring coupling on the same morning as the accident, or on the day previous. The reason was that they were loose. He himself had found a piece of coupling lying on the floor. It had come apart, and a piece of the coupling had broken out. He immediately went and examined the coupling. He said that he did not remember that the general manager had told him to keep watch of that particular coupling, to see that it would not get loose. He modified this by saying: "I can't positively say that he did not do that. I can say, if he did, he did not make it impressive enough so that I remember it."

4. A consideration of especial importance is that plaintiff's position at the time of the accident necessarily involved close proximity of his eyes to the revolving coupling. That coupling, projecting, as it did above the beam, was in the direct and necessary line of his vision. He himself testified: "Q. Any one who looked toward the line shaft in the neighborhood of where that coupling was could see it? A. Yes, sir. * * * If a man looked toward it he wouldn't help but see it." In view of plaintiff's own version of this matter, it is not necessary to consider the question of probable obscurity of the light or the presence of accumulated dust. His own words show that he looked where there was no danger, but failed to see the imminent peril right at his feet, in

the direction in which he was going, and which he was forced to look at by virtue of his stooping.

5. Plaintiff knew of the danger and appreciated the risk. To the ordinary servant it might have been that the coupling, revolving at the rate of one hundred eighty or more times a minute, would have presented an appearance which might have been mistaken for the shaft. Cf., e. g., Larson v. Haglin, 103 Minn. 257, 114 N. W. 958. Plaintiff, however, was an expert. On the morning of, or on the day before, the accident he had assisted in repairing a companion coupling. He knew of the presence of the bolts and of their projection. He had heard of instances where men had clothes caught on bolts and set screws on the same kind of coupling as that here involved on the same appliances and shaft. He knew it would not be safe for a man to run against such a coupling or to get his clothes caught. He never thought that there was danger, although, if he had discussed it with any one, he would have said it was a dangerous piece of apparatus. He knew, as a man of mechanical experience, that it was not a safe thing to come in contact with it when it was moving. Plaintiff's testimony on this subject, in answer to questions asked by his own counsel, does not materially tend to alter this view of the case. Taking the testimony as a whole, and giving due weight to the prominence of the revolving shaft directly in the line in which plaintiff's previous opportunity and general and special occasion to observe the existence and character of the coupling, not casually, but in the performance of his duty, we are of opinion that his own testimony shows knowledge of danger and appreciation of risk.

Finally, plaintiff attempted to apply the belt dressing in an extremely dangerous place, despite the fact that there were other safe and practical means of accomplishing his purpose. A friction clutch was provided. If it had been used, the injury could have been avoided. Plaintiff himself testifies that, if the friction clutch had been working, its use would have been the quickest way of preventing friction on the driving pulley. If he had thrown it out of gear and stopped the slipping, he could have applied the belt dressing on the belt as it was moving, if it was moving. The testimony did, it is true, tend to show that at other times prior to the accident the friction clutch had been out of order; but there was uncontradicted and positive testimony that it

was in order at the time of the accident. It was plaintiff's own judgment at the trial that he could have applied the belt dressing with great convenience and safety, taking all things into consideration, on a side of the platform other than that to which he attempted to apply it. Upon the whole record this consideration does not impress us as having the conclusive force attributed to it by defendant's counsel, because of the servant's right to rely upon the performance of the master's duty to safeguard machinery, and because it does not necessarily impeach the care exercised by plaintiff that his hindsight had proved better than his foresight. None the less plaintiff's actual knowledge of this coupling and of its unprotected condition, and the knowledge which the record reasonably attributes to him, does not furnish justification to his action in disregarding the plain evidence of his own senses and in refusing to avail himself of several means at hand for doing the work.

It remains to consider the fact on this state of facts of the emergency element of the case. The rule is clear that if the servant's position was dangerous, owing to his master's negligence alone, and the servant exercised the care of a prudent man, that was all that was required; that where one in such position, not having time to judge the best way of doing, selects a method not the best, the law would not impute negligence so readily as if he had time to choose; that another might have done differently; but the only question was, what did care and prudence require, and did he do it? Pennsylvania v. Varnau (Pa.) 15 Atl. 624. The usual application of that principle has been made in cases in which the servant himself is placed in a position of peril. Undoubtedly it may properly be invoked, also, in cases in which danger is threatened to the employer's instrumentalities or place of business. In the case at bar, however, it is more accurate to say that there was occasion for promptness, rather than that any considerable emergency had arisen. The only danger that is pointed out to us is to the belt itself. It might have burned where it was smoking. No danger to the buildng, machinery, or to employees is asserted. There was no unexpected or imminent danger in nature likely to affect the judgment. The conclusion must follow that the stress of circumstances was not so great as to exonerate plaintiff from the consequences of his own conduct.

Affirmed.

On April 16, 1909, the following opinion was filed:

PER CURIAM.

Plaintiff, in his motion for reargument, calls to our attention considerable relevant testimony which was not referred to in the memorandum. All of it had been considered by the court. The only new matter, properly speaking, was the contention that on the record the distance between the beam on which plaintiff walked and the roof increased, instead of decreased, as he approached the place of danger. If the plaintiff be right and the defendant mistaken, both in its model produced before this court and in its construction of the record, we are at a loss to see how this would affect the conclusion. In his motion for reargument defendant reiterates, what we regard as conclusive, that he was stooping, and in a cramped position, at the time the harm complained of occurred to him. It is the fact of his position, and not the cause, which is material.

Motion denied.